**TASI MAUGA, Plaintiff**

**v.**

**PIONEER PACIFIC FINANCIAL SERVICES, INC.,
a corporation, Defendant**

High Court of American Samoa
Trial Division

CA No. 110-89

July 19, 1990

Before KRUSE, Chief Justice, and TAUANU'U, Chief Associate Judge.

Counsel: For Plaintiff, Robert A. Dennison III
  For Defendant, John L. Ward II

*Introduction*

Plaintiff, Tasi Mauga, filed suit against defendant, Pioneer Pacific Financial Services, Inc., alleging the latter's breach of an agreement to pay him certain commissions on premiums for life insurance policies purchased through the defendant by employees of the American Samoa Government (hereafter "A.S.G."). Plaintiff claims that these commissions were promised him by defendant's principal, Mr. Tennyson K.W. Lum, in exchange for plaintiff's help in persuading

16

A.S.G. to collect insurance premiums from its employees through a payroll deduction plan.

Plaintiff initially met Mr. Lum at a time when the latter's company was in the application process for the requisite permits to sell insurance in the territory. The application seemed to be thoroughly bogged down in a morass of bureaucratic red tape. Plaintiff, who was then an A.S.G. department director, came to learn of the defendant's difficulties and offered his assistance to Mr. Lum. The latter candidly testified that he was not averse at the time to any sort of help available from a high government official in the light of his company's plight --- officialdom had somehow managed to lose the various application forms submitted by defendant, who was then required to resubmit new forms.

### Discussion

In these circumstances, it is difficult to resist the conclusion that plaintiff held himself out as being in the position to trade in influence, while at the same time a somewhat desperate defendant presented itself as being in the market to buy. Furthermore, it appears quite clear that neither party cared to focus on the possible ethical implications of their newly formed liaison, and here lay the seeds of the controversy. Apart from a generalized expectation of service and payment, neither party was clear at the outset as to the details of the agreement, that is, the extent of performance expected of plaintiff and the compensation payable by defendant.[1] With the benefit of hindsight, however, both sides now have very definite ideas on what the resulting agreement ought to have been. Plaintiff feels that he has provided the defendant with real value since the success of the defendant's venture depended on A.S.G.'s cooperation with a payroll withholding scheme. On the other hand, defendant has lately concluded that it has maintained a payment schedule which defies any commercial sense. Among other things, Mr Lum has subsequently discovered that A.S.G. extended similar collection facilities to other institutions and he now wonders whether plaintiff had indeed anything of value to trade with at the time. We look to the facts.

We find on the evidence that plaintiff did, in July 1988, contact the A.S.G. Treasurer's office concerning the collection of insurance premiums through payroll deduction and that plaintiff was in turn advised

---

[1] "Influence" is not exactly the sort of commodity which lends itself to ready expression in a written agreement.

17

that such deductions for premiums could be accommodated if at least one hundred employees were involved in such an insurance plan. We are also satisfied that plaintiff assisted in signing up a certain number of A.S.G. employees towards meeting the required number of participants, and that at some time towards the end of September 1988, a payroll deduction for the premiums was implemented by A.S.G.

We also find that Mr. Lum mailed plaintiff an unsigned contract form purporting to set out defendant's commission agreement with plaintiff (hereafter the "contract form"). The contract form sets out a commencement date of 26 September 1988 and essentially envisages plaintiff as an independent "enroller" soliciting insurance clients and collecting premiums on defendant's behalf.[2] The contract form also contains a termination clause as well as a remuneration clause which sets out an "[e]nroller's fee" schedule which is tied to the dollar amount of premiums collected by plaintiff.[3]

## I. Side Agreement Commissions

At the very end of the contract form, there is a clause which is introduced as a "side Agreement." It stipulates defendant's agreement "to pay two per cent (2%) of the payments made by way of the Payroll deduction oa [sic] the American Samoa Government Treasury Dept. for a period of five years (5) from the effective date of this agreement . . . ." This side agreement further provides that "[a]ll fees are to be paid within 30 days in receipt of the payment from the Treasury Dept. This Agreement will terminate on 25 Sept. 1993 unless other provisions have been violated and termination is executed." Plaintiff signed this contract form in the space provided for his signature and then mailed the document to defendant's Honolulu office. He saw no more of the original thereafter; however, he made a copy for his own records. Subsequently, plaintiff was paid enrollment fees as contemplated by the mentioned remuneration clause; he also began receiving a two percent (2%) commission (in envelopes marked "confidential") on A.S.G. collected moneys as proposed by the mentioned "side Agreement" clause. The commission payments were haphazardly made, and in several

---

[2] Plaintiff described himself on the stand as having previously worked for defendant as a "life insurance salesman."

[3] The parties are in agreement that an enroller's fee is a one time payment made for signing up life insurance clients. There is no dispute here with enroller's fees.

18

instances payments were delayed apparently without regard to the side agreement's 30 day time limitation for payment.

With fiscal year 1989, there came a change in administration. The incoming treasurer determined that A.S.G.'s continued involvement as a "collection agency for insurance firms," was an unnecessary administrative expense on government. Consequently, the treasurer issued a memo, dated May 22, 1990, giving notice to the insurance companies involved (then numbering four) that A.S.G. would no longer deduct life insurance premiums on its payroll. Following this announcement, the insurance companies sought to have the payroll deduction reinstated by tendering the idea of a reasonable service charge. Within the intervening pay period, negotiations with the treasurer were satisfactorily concluded and a payroll deduction scheme was revived. A service fee of fifty cents ($0.50) per transaction per pay period was agreed upon, with the service limited "to transactions for loan repayments, savings, deductions for A.S.G. employees' life insurance premiums, and deferred compensation plans only." The defendant stopped paying the two percent (2%) side agreement commission.

Without too much thought or even regard for consistency, Mr. Lum on the witness stand attempted a number of explanations for the cessation of these payments (obviously with the apparent hope that something would fly). These explanations varied in range: that his company invoked the contract form's termination clause; that as a businessman he had determined that it did not make any business sense to continue paying these commissions; that the payment of these commissions for a period of one year was about fair; that the contract form --- which Lum said he had not signed and which sets out the side agreement for a five year period of 2% commissions, as well as the termination clause which Mr. Lum also relies upon ---- was merely something he had sent out to plaintiff as a talking paper rather than as a finalized agreement.

II.    *Sales Commissions*

Plaintiff also was able to earn additional commissions as a salesman for defendant by soliciting policy applications for the various insurance companies represented by defendant. A written agreement to this effect was entered into by the parties. The agreement incorporated different commission schedules for the different principal companies represented. Plaintiff's complaint here is two-fold. The first complaint --- that Mr. Lum was only paying his American Samoan agents, including

19

plaintiff, half of what he pays elsewhere and of what is traditionally payable in the industry --- is without merit. Although interesting, and perhaps of relevance in another context, plaintiff is bemoaning exactly that which he bargained for in the written agreement he had signed. Plaintiff's second complaint relates to defendant's withholding of $2,743.02 of earned commissions for 1989. These monies reflect a withholding of twenty five percent (25%) of plaintiff's commissions set aside by defendant in an escrow account to offset the contingencies arising with lapsed and cancelled policies. (It goes without saying that insurance companies will expect reimbursement of commissions paid out in advance on a policy which is no longer generating the anticipated premium.) According to defendant, these commission balances are payable on the 13th month following the policy anniversary date less adjustments for charge-backs by the principal insurance company.

Plaintiff's primary contention is that the withholding practice was not provided for in their agreement and was something which Mr. Lum unilaterally insisted upon sometime after the written agreement.

*Conclusions*

*I.     Side Agreement Commissions*

We conclude that an agreement existed between the parties as evidenced by the contract form. For certain services rendered, defendant sent plaintiff a document (the contract form) stipulating a *two* percent commission (as opposed to a *five* percent commission claimed by plaintiff as the original promise verbally made) and a *five* year period (as opposed to an original verbal offer of *ten* years as also claimed by plaintiff). The terms and conditions set out in the contract form were accepted by plaintiff when he added his signature and returned the contract form to defendant. His acceptance is also clearly corroborated by his acceptance of payments which the defendant made in accordance with the provisions of the contract form. On the other hand, defendant's subscription to the terms and conditions of the contract form is evidenced by its having performed thereunder by making commission payments to plaintiff. Whether defendant executed the contract form or not is immaterial; its performance unequivocally signified its consent.

The real dispute centers on termination. Defendant eventually sent plaintiff a delayed response for the nonpayment of commissions. By letter dated November 26, 1989, the defendant stated that the government's service fee was an expense not discussed at the time of

20

agreement. Furthermore, the defendant cited the contract form's termination clause[4] as "specifically stat[ing] that if any disruption was to occur with the payroll deduction the Agreement would be terminated automatically . . . ." The letter also belatedly gave notice that commissions were no longer payable after July 1, 1989.

Plaintiff, on the other hand, argues that the payroll deduction plan which he had secured for defendant from A.S.G. was not discontinued within the meaning of the termination clause. Rather, he contends that the effect of the government's action was to merely "suspend" payroll deduction for one pay period.

This argument has no merit. The payroll deduction plan which plaintiff had something to do with was effectively discontinued by A.S.G. as contemplated in the termination clause. The treasurer's agreement to reinstate a payroll deduction service for the different insurance companies involved had all to do with money --- a service fee --- and absolutely nothing to do with plaintiff's prior efforts. The previous payroll deduction service relative to plaintiff's efforts was, as of the pay period commencing May 22, 1989, clearly cancelled by the treasurer in no uncertain terms. Indeed, money had purchased for the defendant an expanded service beyond the mere collection of life insurance premiums; the service now offered by A.S.G., according to the treasurer's letter of June 5, 1989, included the collection of loan payments, savings, and deferred compensation deposits.

We conclude that the government's cancellation of the payroll deduction service as aforesaid provided the defendant grounds to invoke the termination clause. However, having said that, we also conclude that the agreement did not terminate as of June 30, 1989, but as of December 31, 1989. The termination provision also provides a specific procedure for terminating the contract. This clause provides that "[either party] may terminate this Agreement *by giving notice in writing to the other at least thirty days prior to such termination date.*" (Emphasis added). Since the defendant's written notice to plaintiff consistent with the requirements of the termination clause was not provided until sometime after November 26, 1989, the agreement did not, therefore, terminate until thirty (30) days after notice to plaintiff. We hold that commissions

---

[4] Among other things, this clause essentially provides that either party may terminate the agreement by giving the other 30 days notice, however, "[s]uch termination will not terminate fees paid as listed below except for the following reasons: . . . 3) The Government deduction setup thru (sic) the payroll is discontinued."

are payable by the defendant to plaintiff on all life insurance premiums withheld by A.S.G. through payroll deduction up to the pay period ending January 6, 1990.

## II.    Sales Commissions

We agree with plaintiff that defendant's withholding practice is outside the ambit of the parties' agreement and may not be unilaterally insisted upon by defendant. (Although the fine print on Sunset Life's fee schedules state that "[a]ll commissions payable are subject to rules and practices as amended from time to time by Company," the meaning of this condition was not expanded upon in the evidence and the condition as it stands certainly does not strike us as having the meaning whereby defendant can do with the contract as it pleases.)

We hold that the earned commissions totalling $2,743.02 are now due and payable to plaintiff subject to any offsets for charge-backs which have now accrued. Although our decision necessarily means that defendant must chase down plaintiff for reimbursement of future charge-backs, that is more consistent with the written agreement than the unilateral invention of a withholding scheme simply because that makes business sense to the defendant.

On the foregoing, the defendant shall, within 20 days from date hereof, file with the Clerk a verifiable accounting of commissions consistent with our conclusions herein. Thereafter, judgment will be entered accordingly.

It is so Ordered.